## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| VICTORIA ANN ICEMAN, | CASE NO. 1:23-CV-00877-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OF OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff Victoria A. Iceman challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On September 26, 2023, the parties consented to my exercising jurisdiction pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #11). Following review, and for the reasons stated below, I **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings consistent with this opinion.

PROCEDURAL BACKGROUND

Ms. Iceman filed for DIB on May 15, 2020, alleging a disability onset date of September 4, 2012. (Tr. 156). She later amended the onset date to January 1, 2019. (Tr. 170). After her claim was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge. (Tr. 54-63, 65-74, 92-93). Ms. Iceman (represented by counsel) and a vocational expert (VE) testified before the ALJ on March 15, 2022. (Tr. 35-52).

On April 20, 2022, the ALJ found Ms. Iceman not disabled. (Tr. 12-31). The Appeals Council denied Ms. Iceman's request for review on March 14, 2023, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Iceman timely filed this action on April 27, 2023. (ECF #1).

FACTUAL BACKGROUND

## I.     Personal and Vocational Evidence

Ms. Iceman was 46 years old on her amended alleged onset date and 49 years old at the administrative hearing. (Tr. 37). After graduating high school, she obtained her cosmetology license and worked as a stylist. (Tr. 37-38).

## II.    Administrative Hearing

At the hearing, Ms. Iceman testified she worked as a hair stylist for 31 years. (Tr. 39). She used to work six days a week but around 2018 or 2019 she reduced to one or two days a week. (Tr. 38). She currently works two to three days a month to maintain her license and usually services just one or two clients per workday. (*Id.*).

Ms. Iceman has severe ulcerative colitis. (Tr. 40). At one point, she was admitted to the hospital and found to have bleeding ulcers in her colon and rectum along with sepsis. (*Id.*). She was transported to Cleveland Clinic where surgeons removed her gall bladder, appendix, small intestine, rectum, and colon. (*Id.*). She used a colostomy bag until she received a J-pouch.[1] (*Id.*).

---

[1]     A J-pouch is constructed from the end of a patient's small intestine and acts as a replacement for the patient's colon and rectum. Cleveland Clinic, *J-Pouch Surgery*, http://my.clevelandclinic.org/health/treatments/21062-j-pouch-surgery (last accessed Mar. 28, 2024).

Since the surgeries, Ms. Iceman has had C. diff[2] and anal fissures requiring surgery, often experiences pouchitis[3] and cuffitis,[4] and received anal Botox injections for pain until treatment became too expensive. (*Id.*). She is on 12 prescriptions, uses rectal cream for anal burning, and receives monthly IV biologic infusions. (Tr. 41). She used to receive infusions every two months but, due to the severity of her condition, her doctor increased the frequency. (*Id.*). Each infusion takes a couple hours. (*Id.*). Ms. Iceman informed the ALJ of impending upper and lower gastrointestinal scopes to investigate and treat rectal bleeding and bloody vomit. (Tr. 44).

Ms. Iceman cannot work full-time because she needs easy and frequent access to the bathroom, 25 to 30 times a day, even with Imodium. (Tr. 39-40). She has had much of her gastrointestinal system removed and always feels nauseous. (Tr. 39). Because everything from her stomach travels directly to her anus, including bile, she often experiences anal burning and frequently has an anal infection. (*Id.*). She often feels dehydrated despite drinking plenty of water. (Tr. 46).

Before suffering from gastrointestinal issues, Ms. Iceman lived a very different life. (Tr. 47). She described going to the gym five to six days a week and working in the salon six days a week.

---

[2]     Clostridioides difficile (C. diff) is a germ that causes diarrhea and colitis. Other symptoms include fever, stomach pain, loss of appetite, and nausea. Centers for Disease Control and Prevention, *What is C. diff,* http://www.cdc.gov/cdiff/what-is.html (last accessed Mar. 28, 2024).

[3]     Pouchitis is inflammation occurring in the lining of a J-pouch. Symptoms include diarrhea, abdominal pain, joint pain, cramps, fever, increased number of bowel movements, nighttime stool leakage, difficulty controlling bowel movements, and a strong urge to have a bowel movement. Mayo Clinic, *Pouchitis,* http://www.mayoclinic.org/diseases-conditions/pouchitis/symptoms-causes/syc-20361991 (last accessed Mar. 28, 2024).

[4]     Cuffitis is inflammation or narrowing of the area where the J-pouch connects to the anus. Cleveland Clinic, *Ileal Pouches,* http://my.clevelandclinic.org/health/treatments/15549-ileal-pouches (last accessed Mar. 28, 2024).

(*Id.*). She and her husband used to enjoy international travel. (*Id.*). Now, she takes four to six Imodium a day to ease some of the diarrhea, takes medication for hypertension and anxiety, and on the rare occasion she leaves her house, carries extra clothing in case of an accident and knows where to find the bathrooms. (Tr. 47-48). Some days, she cannot get out of bed due to rectal pain, nausea, exhaustion, and rash. (Tr. 44). Other days, she does what she can around the house, cooks, and washes dishes, but must always be close to a bathroom. (*Id.*). On her best day, Ms. Iceman has no burning rectal pain or stomach acid issues, can go to the bathroom without excruciating pain, albeit on a frequent basis, and has a little energy. (Tr. 47). She has one day like this about every two weeks. (*Id.*).

Ms. Iceman soils her underwear daily, pants and underwear several times a week, and her accidents require a change of shoes and socks about twice a month. (*Id.*). She has had accidents in public. (*Id.*). Ms. Iceman vomits a few times a week and has night incontinence about twice a month. (*Id.*). She cannot fully clean the house like previously did. (Tr. 45). Ms. Iceman does not leave the house often due to anxiety about having an accident; when she does go out, her trips are short and she carries extra pants, shoes, and socks. (Tr. 45-46).

Ms. Iceman struggles to afford some of her treatments and cannot afford others at all. (Tr. 43). For instance, Vancomycin – used to treat pouchitis and cuffitis – costs $3,000. (*Id.*). She could not use a suppository her doctor prescribed because a one-month supply cost $50,000. (*Id.*).

Ms. Iceman can be on her feet for about 25 to 30 minutes at a time before she needs to rest or use the bathroom. (Tr. 41-42). Using a pillow and a heating pad, she can sit for about a half-hour before shifting positions due to anus pain or lower back pain. (Tr. 42). Walking flights of stairs causes anus pain. (*Id.*). Because of the J-pouch, she is restricted from lifting more than 20

4

pounds. (*Id.*). When Ms. Iceman bends over, her lower incision pulls in air, causing gas build-up that she must hold until finding a restroom; otherwise, she risks an unintended bowel movement. (Tr. 42-43).

The VE testified that a person of Ms. Iceman's age, education, and experience, with the functional limitations described in the ALJ's RFC determination, could perform her past relevant work as a hair stylist, a light exertion, skilled position. (Tr. 49). The VE identified other light, unskilled positions the hypothetical individual could perform, including ticket taker, school bus monitor, and furniture rental clerk. (Tr. 50). The VE also testified employers tolerate no more than one absence from work each month. (Tr. 51). The individual could not maintain steady employment if she required two to three unscheduled bathroom breaks each hour or if she needed to use the bathroom to change soiled clothing. (Tr. 50-51).

### III.    Relevant Medical Evidence

On September 4, 2012, after years of ineffective ulcerative colitis treatment, Ms. Iceman underwent a laparoscopic total colectomy with end ileostomy.[5] (Tr. 777; *see also* Tr. 791). Pathology testing on the removed portions showed severely active inflammatory bowel disease most consistent with fulminant ulcerative colitis, with appendix involvement and multiple reactive lymph nodes. (Tr. 771).

---

[5]      Total colectomy is a procedure to remove the colon – the largest part of the large intestine – and performed to treat, among other things, ulcerative colitis that does not respond to medications. Mayo Clinic, *Colectomy,* http://www.mayoclinic.org/tests-procedures/colectomy/about/pac-20384631 (last accessed Mar. 28, 2024).

Ileostomy is a surgical procedure where the ileum is turned inside out and sutured to the abdomen to create a stoma for digestive waste elimination. Cleveland Clinic, *Ileostomy,* http://my.clevelandclinic.org/health/treatments/21726-ileostomy (last accessed Mar. 28, 2024).

On March 5, 2013, Ms. Iceman underwent a proctectomy[6] and ileoanal anastomosis (J-pouch) surgery with loop ileostomy. (Tr. 734-35). She was discharged from the hospital on March 14, 2013. (Tr. 754).

On June 5, 2013, Ms. Iceman underwent surgery to close the ileostomy. (Tr. 705). The surgery revealed multiple adhesions around the ileostomy that required resecting the damaged area and removing an additional 1.5 inches of bowel. (Tr. 705-06). Post-surgery, Ms. Iceman complained of pain in the anal sphincter. (Tr. 700).

On June 26, 2013, Ms. Iceman underwent revision of the J-pouch surgery ("pouch freed from internal sphincter") to address post-operative anal pain. (Tr. 698-99). After the operation, she continued to have rectal pain, cramping, and diarrhea. (Tr. 697). She reported using the bathroom five to six times nightly. (*Id.*). She received Loperamide to treat diarrhea. (*Id.*). Her anal pain continued. (Tr. 683, 692).

On November 6, 2013, she underwent pouchoscopy and another J-pouch revision to release the entrapped internal sphincter on the right side. (Tr. 680-81). Pouchoscopy, an examination performed under anesthetic, showed a healthy pouch without signs of pouchitis. (Tr. 680). After surgery, she complained of rectal spasms. (Tr. 682). At the end of the month, pouchoscopy revealed a healthy pouch and she received her first anal Botox injection to denervate the internal sphincter. (Tr. 675-76).

In May 2014, she had flu-like symptoms, rectal bleeding, and frequent bowel movements (25 to 30 per day) for two weeks. (Tr. 672). She received antibiotics. (*Id.*).

---

[6]     Proctectomy is a procedure to remove the rectum. Stedmans Medical Dictionary, 724840 *Proctectomy.*

In June 2014, Ms. Iceman described continued rectal pain, dull at baseline and stabbing after having a bowel movement. (Tr. 670). She also reported lethargy, nausea, diarrhea, abdominal discomfort, and frequent bowel movements (18-20 a day at baseline). (Tr. 670-71). Examination was normal. (Tr. 671-72).

On June 30, 2014, Ms. Iceman went to the emergency department for rectal pain. (Tr. 667-68). She described the pain as severe and obtained only mild relief with Percocet. (Tr. 668). She had abdominal tenderness and significant rectal tenderness. (Tr. 669). She described feeling worse when she met with Dr. Church the following day. (Tr. 667). Rectal digital examination revealed inflammation in the anal transition zone (ATZ) area. (*Id.*). Dr. Church felt it likely pouchitis and prescribed antibiotics. (*Id.*). She continued antibiotics through September 2014. (Tr. 665-66).

On October 29, 2014, Ms. Iceman underwent cholecystectomy to remove her gall bladder. (Tr. 662).

On January 23, 2015, Ms. Iceman complained of anal pain, described as throbbing, constant, and increased when on her feet for long hours. (Tr. 645). She also reported diarrhea, rectal bleeding twice a week, extreme stomach aches and vomiting, having 20 to 30 bowel movements per day, including five to eight at night. (*Id.*). She was taking nine Imodium every day. (*Id.*). On examination, her abdomen was soft, non-tender, and without masses or hernias but rectal examination revealed an abnormally tight anus. (*Id.*). Pouchoscopy showed patchy ulcerations over the staple lines of the J-pouch, which itself was twisted and kinked. (*Id.*). Dr. Church determined possible pouchitis and, depending on the biopsy results, would consider consulting with Dr. Bo Shen for a pouch augmentation. (*Id.*). The results showed inflammation without dysplasia and Dr. Church recommended Ms. Iceman consult with Dr. Shen for treatment. (*Id.*).

On February 17, 2015, Ms. Iceman met with gastrointestinal specialist Dr. Shen and complained of rectal pain, diarrhea, and constant fatigue. (Tr. 640). She also endorsed frequent bowel movements, nocturnal incontinence, nausea and vomiting, and intermittent fever. (Tr. 641). Physical examination was normal. (Tr. 643). Dr. Shen ordered tests to determine if she had pouchitis or if the issue was ischemic or autoimmune, and additional testing to determine if a neuroma was causing her rectal pain. (Tr. 644). He also referred Ms. Iceman to consult with hepatology to exclude autoimmune hepatitis. (*Id.*). On February 23, Dr. Shen prescribed a two-week course of vancomycin to treat C. diff. (Tr. 639-40). Two days later, Ms. Iceman called Dr. Shen and reported migraine and nausea after she started vancomycin. (Tr. 63).

At the end of March 2015, a pouchoscopy showed cuffitis with nodularity, C. diff returned, and a pelvic MRI revealed a hemorrhagic ovarian cyst on the right. (Tr. 629). Ms. Iceman described 10 to 15 bowel movements a day and intermittent abdominal pain. (Tr. 628). Dr. Shen ordered a repeat C. diff test and discussed a fecal material transplant (FMT) procedure, prescribed a suppository for cuffitis and added a foam steroid, ordered her to stop one antibiotic but finish the course of another, and recommended follow-up with gynecology to evaluate the ovarian cyst. (Tr. 629). A day later, she received anti-nausea medication. (Tr. 626). By April 20, 2015, her diarrhea had resolved. (Tr. 625).

On May 19, 2015, Ms. Iceman called Dr. Shen's office after again having diarrhea. (*Id.*). Following another two-week course of antibiotics, she continued to have diarrhea. (Tr. 623). She continued to have diarrhea despite medications and, in July 2015, experienced increased symptoms, including 30 or more bowel movements a day and 10 to 12 a night. (Tr. 620-23). She

received a different antibiotic, Xifaxan, and experienced associated side effects of pouch cramping and rectal irritation. (Tr. 619-20).

In August 2015, Ms. Iceman called Dr. Shen and complained of a perineal rash, anal pain, and frequent bowel movements (25 a day). (Tr. 618-19). She endorsed taking four to six Imodium twice a day. (Tr. 619). Dr. Shen prescribed a hydrocortisone cream and lidocaine to apply rectally, prescribed suppositories, and ordered another C. diff test. (Tr. 619).

In November 2015, Ms. Iceman reported 20 to 30 watery bowel movements a day with significant rectal urgency and anal pain. (Tr. 615). Dr. Shen switched the hydrocortisone cream for another suppository and suggested hyperbaric oxygen therapy. (*Id.*).

In May 2016, Ms. Iceman had another bout of cuffitis caused by mild cuff prolapse. (Tr. 612). She also complained of tail bone pain. (Tr. 613). She was instructed to not lift more than 20 pounds, avoid straining during a bowel movement, and avoid all exercises that stress the abdominal core muscles such as lifting, push-ups, and sit ups. (Tr. 612). She continued to report 25 to 30 bowel movements a day, tailbone pain, urgency, external and internal rectal burning, sleep disturbances. (Tr. 592, 606, 610). In addition to her other suppositories, she received belladonna opium suppositories for pain. (Tr. 588).

In January 2017, Ms. Iceman reported intermittent rectal bleeding and 10 to 25 bowel movements a day. In March 2017, she reported significant rectal pain and some rectal bleeding, 30 or more bowel movements a day, lots of bloating, sleep disturbance, nighttime incontinence, abdominal pain, fatigue, and diarrhea. (Tr. 586). Physical examination was normal. (*Id.*). Dr. Shen prescribed Entyvio, an infusion medication received every eight weeks, and ordered labs and X-rays. (*Id.*).

9

In October 2017, Ms. Iceman endorsed 20 to 30 bowel movements a day with bloating, nausea, and rectal bleeding. (Tr. 570). A November 2017 pouchoscopy was normal and Ms. Iceman received another anal Botox injection into the internal sphincter. (Tr. 568).

On March 5, 2018, Ms. Iceman met with primary care physician Daniel Burwell, D.O., for hypertension, anxiety, and chronic pain. (Tr. 330). She complained of abdominal pain and changes in bowel habits and exhibited abdominal tenderness. (Tr. 331). Dr. Burwell prescribed Xanax for anxiety and Percocet for pain. (*Id.*).

In May 2018, Ms. Iceman continued to have abdominal tenderness and rectal pain. (Tr. 340). Dr. Burwell refilled Ms. Iceman's Xanax prescription and lowered her dose of Percocet. (*Id.*).

In August 2018, Ms. Iceman had a flare-up with rectal bleeding, rectal pain (like sitting on glass), diarrhea, bloating, and abdominal pain and described 40 bowel movements a day. (Tr. 565). Ms. Iceman refused an appointment because she could not sit in a car for the 90 minute travel to the appointment. (*Id.*).

In September 2018, Ms. Iceman reported to Dr. Shen having 25 bowel movements a day, significant rectal urgency with incontinence, abdominal pain, bloating, fatigue, arthralgias, gas, and nausea. (Tr. 564). On September 5, 2018, Ms. Iceman met with Dr. Burwell and reported rectal bleeding, chronic diarrhea 25 to 30 times a day, chronic rectal pain, headaches, night sweats, sleep disturbances, and anxiety. (Tr. 349). Physical examination revealed increased bowel sounds. (Tr. 350). Dr. Burwell prescribed a hydrocortisone rectal cream and refilled prescriptions for Xanax and Percocet. (*Id.*).

In October 2018, Dr. Shen performed another pouchoscopy that was normal except some inflamed skin in the anal canal and a small posterior fissure. (Tr. 557-58). Ms. Iceman received another anal Botox injection. (Tr. 557).

On December 28, 2018, Ms. Iceman met with Dr. Burwell and reported functioning well at work and home and tolerating her medications. (Tr. 266). The doctor refilled her medications. (Tr. 369).

In April 2019, Ms. Iceman continued to report functioning well at work and home and tolerating her medications. (Tr. 376). Dr. Burwell refilled her prescriptions. (Tr. 379).

Pouchoscopy in May 2019 revealed mild stenosis of the ileal pouch anal anastomosis with very liquid stool. (Tr. 549-51).

On July 1, 2019, Ms. Iceman described taking half a Xanax in the morning and one at night for chronic anxiety and four Percocet daily for chronic pain from Crohn's disease and chronic rectal pain. (Tr. 388). She reported weaning herself off Xanax but did not sleep for three nights. (Tr. 389). She continued to endorse rectal bleeding, diarrhea 25 to 30 times a day, and rectal pain. (Tr. 392). Dr. Burwell continued her medications. (Tr. 393).

On September 24, 2019, Ms. Iceman met with Dr. Burwell and endorsed the same complaints. (Tr. 404). Dr. Burwell refilled her prescriptions. (Tr. 405).

In December 2019, Ms. Iceman reported not sleeping well and wanted to try trazodone. (Tr. 412). Dr. Burwell refilled her prescriptions and prescribed trazodone, lidocaine, and Zofran. (Tr. 417).

In April 2020, Ms. Iceman complained of severe rectal pain. (Tr. 426). Dr. Burwell refilled her medications. (Tr. 429). He did the same in July and October 2020. (Tr. 461, 476).

In May 2020, Ms. Iceman met with Benjamin Click, M.D., to establish care as a new patient to replace Dr. Shen. (Tr. 541). She described numbness in both legs, painful rash on the buttocks, sharp anal pain when bending over, and worsened burning rectal pain. (*Id.*). Ms. Iceman endorsed some relief with Entyvio but lasting only five weeks. (Tr. 544). Dr. Click increased the frequency of infusions to every four weeks. (*Id.*). He determined the buttock rash was likely related to chemical irritation from stool exposure and prescribed Desitin cream for the rash and Colestid for diarrhea relief. (*Id.*).

On July 30, 2020, Ms. Iceman reported frequent bowel movements, rectal pain, sleep disturbance, indigestion with acid reflux, and fatigue. (Tr. 535). In October 2020, she called Dr. Click after intermittently vomiting acid for several weeks. (Tr. 534). She reported that Colestid helped with diarrhea. (*Id.*). She was prescribed Omeprazole. (*Id.*).

On January 20, 2021, while scheduling a pouchoscopy, Ms. Iceman described intermittent rectal bleeding. (Tr. 1357). She had the pouchoscopy on February 5, 2021. (Tr. 1449). Dr. Click did not see any abnormality with the pouch and felt she had irritable pouch. (Tr. 1462). The pouch biopsy revealed focal active enteritis and the cuff biopsy showed chronic minimally active colitis with prolapse-type changes. (Tr. 1458). Dr. Click recommended continuing Colestid, Imodium, and Lomotil, testing for C. diff, referred Ms. Iceman to a psychologist, and ordered an esophagogastroduodenoscopy (EGD) to investigate nausea and vomiting. (Tr. 1592).

On April 19, 2021, Ms. Iceman reported neck pain and bilateral upper arm pain, worse when working or sleeping. (Tr. 1423). She had bilateral cervical muscular tenderness and physical examination was otherwise normal. (Tr. 1427-28). Dr. Burwell refilled her medications. (Tr. 1428). On October 15, 2021, a gastroenterologist prescribed Flagyl for pouchitis. (Tr. 1615).

On January 12, 2022, Ms. Iceman met with Dr. Burwell for medication refills. (Tr. 1480). She described rectal pain, moderate relief with Percocet, and aggravation with eating and drinking. (*Id.*). Dr. Burwell refilled her prescriptions. (Tr. 1485).

On January 13, 2022, Ms. Iceman presented at a telehealth session with Dr. Click. (Tr. 1592). She reported frequent diarrhea, nocturnal incontinence, nausea and some vomiting, and rectal rash. (*Id.*). She endorsed taking Colestid that helped with GERD and rash; Imodium was not helpful; and Entyvio was "not doing anything." (Tr. 1592-93). She reported the Botox injection helped but she did not try to schedule another one because she was concerned about COVID. (Tr. 1597). She described having diarrhea 25 times a day with blood, urgency, pain, and distension. (Tr. 1593). Dr. Click suspected "significant irritable pouch syndrome and brain-gut axis dysfunction. Never tried [tricyclic antidepressant]." (Tr. 1597). He prescribed vancomycin and nortriptyline, continued Entyvio and Zofran, recommended A&D ointment for the rash, and ordered labs. (*Id.*).

## IV.    Adult Function Report

On January 14, 2021, Ms. Iceman completed an Adult Function Report, stating her conditions cause "excessive constant diarrhea and gas" and she uses the bathroom at least 25 to 30 times during the day and seven to nine times overnight. (Tr. 208-09). As a result, she sleeps about three to four hours nightly. (Tr. 214). She does not eat at work because she has had accidents during the workday. (Tr. 208). She uses the bathroom three to four times each morning, takes her medicine, and spends most of the day in the bathroom or sitting on a heating pad to ease the burning anal pain that stomach bile causes. (Tr. 209). Her daughter and her husband help to care for her. (*Id.*). Her daughter and husband help around the house because she cannot do more than

about 15 minutes of light housework and straighten up. (Tr. 212). Due to her gastrointestinal

issues, Ms. Iceman cannot work a full week, shop for groceries, work out, or lift over 20 pounds.

(Tr. 209). She leaves the house infrequently and only goes places with readily accessible bathrooms.

(Tr. 210). Ms. Iceman also gets very anxious about leaving the house because she fears having an

accident in public; she takes a Xanax before leaving the house and only leaves the house for short

excursions. (Tr. 213). Her routines are now dictated by proximity to a bathroom. (Tr. 215).

## V.    Medical Opinions

On March 4, 2021, Ms. Iceman attended a consultative psychological evaluation with

James C. Tanley, Ph.D. (Tr. 1387). There, she reported having high blood pressure, Crohn's

disease, and ulcerative colitis with daily nausea, and disturbed sleep because she uses the bathroom

eight to ten times a night. (Tr. 1388). She endorsed taking trazodone, Colestid, metoprolol,

omeprazole, lisinopril, ondansetron, Xanax, Percocet, and Imodium. (*Id.*). Ms. Iceman stated she

closed her salon in 2019 and works one day a week. (*Id.*). (Tr. 1388).

Ms. Iceman described her typical day as starting early, between 4:30 and 6:30 a.m., because

"mornings are the worst for the bathroom." (Tr. 1389). She does light chores, works one day a

week, and takes someone with her whenever she goes grocery shopping. (*Id.*). She is not a member

of any clubs but enjoys being in the yard, swimming, spending time with grandkids, watching

television, listening to the radio, and getting on the internet. (*Id.*). She is usually asleep by 10:30

p.m. (*Id.*). Based on observations and Ms. Iceman's report, Dr. Tanley determined she would have

little or no difficulty with complex and multi-step tasks, but her anxiety symptoms might cause

limits in the areas of attention, concentration, persistence, pace, social interaction, and lower

frustration tolerance. (Tr. 1391).

On April 3, 2021, at the behest of the Social Security Administration (SSA), Ms. Iceman attended a consultative physical examination with Christopher D'Amico, D.O. (Tr. 1393-99). There, she reported a history of spinal and gastrointestinal problems and described her current symptoms, including bile acid, insomnia, diarrhea, back pain, nausea, cramps, and poor vision from lack of sleep. (Tr. 1393). She stated she cannot work because of frequent bowel movements (20 per day) and pain that causes difficulty walking and standing more than three hours. (Tr. 1393, 1397). Physical examination was normal. (Tr. 1395-96). The examination was paused mid-way through so Ms. Iceman could use the restroom. (Tr. 1397). Dr. D'Amico determined as follows:

> The claimant has mild limitations with sitting, standing and walking due to back pain. The claimant does not need an assistive device with regard to short and long distances and uneven terrain. The claimant has mild limitations with lifting and carrying weight due to back pain. There are limitations with bending, stooping, crouching and squatting and the claimant will be able to perform these frequently due to back pain and abdominal problems. There are limitations with reaching, grasping, handling, fingering and feeling and the claimant will be able to perform these frequently due to back pain. There are no relevant visual, communicative, or workplace environmental limitations.

(*Id.*).

On April 13, 2021, Dr. Church completed a Residual Functional Capacity Questionnaire and determined Ms. Iceman's chronic pouchitis caused functional limitations. (Tr. 295-99). He summarized Ms. Iceman's repeat anal dilation surgeries and injections and the percentage of gastrointestinal system removed (100% of the colon; 90% of the rectum), and that she had 25 to 30 bowel movements a day, including five to eight at night, and abdominal and anal pain. (Tr. 296-97). Dr. Church also noted her medications, including Percocet, Entyvio, Colestid, and Botox injections, and her symptoms, including chronic diarrhea, fecal incontinence, rectal bleeding,

abdominal pain and tenderness and distension, fatigue, nausea, and soiling of clothing. (Tr. 297-98). Dr. Church opined Ms. Iceman required the following:

- ready access to a restroom;

- two to three additional breaks per hour for five to ten minutes, on less than five minutes' advance notice;

- ability to lie down and rest throughout the day for 5 to 20 minutes each time;

- ability to shift positions between sitting, standing, and walking at will;

- sit less than 2 hours in an 8-hour workday;

- stand and walk about 2 hours in an 8-hour workday;

- frequently lift less than 10 pounds, occasionally lift ten pounds, and never lift 20 pounds or more; and

- occasionally twist, rarely stoop, and never crouch, climb ladders, or climb stairs.

(Tr. 298-99). Dr. Church further stated Ms. Iceman's conditions produce good and bad days and she would miss work more than four days each month. (Tr. 299).

On April 21, 2021, after review of the medical record, State agency medical consultant Ranna Amiri, M.D., an internal medicine physician, determined Ms. Iceman can frequently lift 10 pounds, 20 pounds occasionally; sit for six hours in an eight-hour workday, stand and walk for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally stoop and crawl; frequently climb ramps and stairs, kneel, and crouch; and must avoid all exposure to hazardous such as operating heavy machinery or working at unprotected heights. (Tr. 61-62).

On reconsideration, State agency medical consultant Mehr Siddiqui, M.D., a neurologist, noted as follows:

Recon notes: Conditions gradually getting worse. More pouch leaks that limit ability to go anywhere; must always be in close proximity to toilet. Always on guard, worried about accidents; can't concentrate. Pouch infections make sicker. Exhausted. Depressing. Victoria should be sent to SPECIALIST that can evaluate her as to Listings, that actually apply to her gastroenterological impairment. The CE report currently in record expressly states that he cannot state an opinion on her J-pouch issues, and states that an evaluation by a SPECIALIST is needed . . . THE DECISION IS CONTRARY TO LAW AND FACT. D'AMICO CE STATED THAT A SPECIALIST EXAM IS NEEDED FOR HER PRIMARY IMPAIRMENT, CROHN'S J-POUCH DYSFUNCTION. THIS SHOULD HAVE BEEN DONE BEFORE AN ADJUDICATION.

(Tr. 67) (emphasis in original). Despite this notation, Dr. Siddiqui affirmed Dr. Amiri's initial determination. (Tr. 72).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet or medically equal one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

> 5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

The ALJ issued an unfavorable decision on April 20, 2022. (Tr. 12-34). At Step One, the ALJ determined Ms. Iceman meets the insured status requirements of the Social Security Act through June 30, 2024 and has not engaged in substantial gainful activity since the amended alleged onset date of January 1, 2019. (Tr. 17-18). At Step Two, she determined Ms. Iceman has severe impairments of ulcerative colitis, Crohn's disease, inflammatory bowel disease, and chronic pouchitis status post multiple surgical procedures. (Tr. 18). At Step Three, the ALJ determined Ms. Iceman does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (Tr. 20). The ALJ reviewed Ms. Iceman's medical records, hearing testimony, and medical opinions and concluded she remains capable of light work with additional limitations including:

> No climbing of ladders, ropes, and scaffolds. Occasional stooping and crawling. Frequent climbing ramps and stairs. Frequent kneeling and crouching. Avoid all

18

exposure to hazards, including operating heavy/hazardous machinery and exposure
to unprotected heights.

(Tr. 21). At Step Four, the ALJ determined Ms. Iceman has no past relevant work. (Tr. 27). At Step

Five, she determined jobs exist in significant numbers in the national economy that Ms. Iceman

can perform and concluded she was not disabled. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's

findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v.

Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial

evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of

Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of

evidence evaluation does not permit a selective reading of the record. Substantiality of evidence

must be based upon the record taken as a whole. Substantial evidence is not simply some evidence,

or even a great deal of evidence. Rather, the substantiality of evidence must take into account

whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x

636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial

evidence, the court does not review the evidence de novo, make credibility determinations, or

weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

19

Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## DISCUSSION

Ms. Iceman brings two issues for review. First, she asserts the ALJ did not sufficiently articulate the required factors when evaluating the medical opinions. (ECF #10 at PageID 1671).

20

Second, she claims the ALJ's RFC is not supported by substantial evidence and argues the ALJ should have considered a limitation allowing for unscheduled bathroom breaks. (*Id.* at PageID 1686). The Commissioner insists the ALJ properly evaluated the medical opinions and reasonably determined that unscheduled bathroom breaks were not warranted because Ms. Iceman's recent examinations were unremarkable and there were compliance issues. (ECF #13 at PageID 1702).

Although the parties provided arguments concerning the ALJ's evaluation of the medical opinion evidence and the RFC determination, my review of the salient issues is thwarted by the ALJ's deficient consideration of the record evidence. For the reasons that follow, remand is inescapable.

Ms. Iceman alleges she cannot work due to pain, fatigue, and frequent bowel movements. (Tr. 39). The ALJ's adverse determination largely focuses on Ms. Iceman's normal physical examinations. (*See* Tr. 22-25). The ALJ also relied on Ms. Iceman's non-compliance with "not returning phone calls or doing lab work," citing her primary care physician's treatment note indicating she "had not had labs for a while." (Tr. 24). As it relates to the medical opinions, a State agency medical consultant reviewed Dr. Church's opinion and determined it was less persuasive because "he relies heavily on the claimant's statements and is not fully consistent with the objective medical evidence." (Tr. 70). The consultant did not identify what objective medical evidence is inconsistent with the opinion. (*See id.*). The ALJ evaluated the opinion evidence and stated as follows:

> The undersigned has read and considered the opinions of the State Agency physical consultants and finds them to be persuasive. Although neither examining nor treating physicians, these experts are medical doctors with knowledge of the Social Security Administration's program and requirements. Their opinion is derived from, and consistent with, the medical evidence of record. As discussed above, the claimant

repeatedly exhibited normal physical examinations that are not supportive of any greater limitations than those opined by the State Agency and adopted herein.

* * *

The opinions of the claimant's provider James Church, M.D. are not persuasive. The questionnaire provided by Dr. Church is very limiting with limitations that exceed those supported by the record. He cites prior history and documents that claimant's own reports of bowel movements, which is inconsistent with her presentation and normal findings on examination as well as actual reports to providers. As his opinion is not fully consistent with the actual objective medical evidence of record, the undersigned does not find his opinion to be persuasive.

(Tr. 25) (citations omitted). The ALJ thus concluded Ms. Iceman's reported symptoms are not

supported by the record:

In addition to the general lack of objective evidence, the evidence of record does not support the claimant's subjective complaints. The records document a long history of surgeries for the claimant's gastrointestinal impairments; however, these surgeries were remote and recent testing was fairly unremarkable with repeatedly normal physical examinations documented. During the period of time when the bulk of the claimant's treatment and surgical procedures were occurring, the claimant was able to work as a self-employed hairdresser full-time. Since her amended alleged onset date of January 1, 2019, the claimant's subjective pain complaints have been treated with Percocet with a treatment records [*sic*] documenting that her condition was stable, and her presentations indicated that she was in no distress with normal examinations exhibited. Though she testified that she often has to use the restroom throughout the day, this is not documented in the records. Compliance issues are also noted in the record, with the claimant missing phone calls, lab work appointments, and medication refills.

(Tr. 24-25).

Crucially, the ALJ relies on normal physical examinations to conclude Ms. Iceman is not

disabled but does not address other objective medical evidence, including numerous biopsies

confirming active chronic inflammation (*e.g.*, enteritis, colitis, proctitis) in what remains of Ms.

Iceman's gastrointestinal system, loose and watery stools observed during pouchoscopies, and

aggressive antibiotic treatment for frequently recurring infections of pouchitis and cuffitis. Despite

22

those normal examinations, Ms. Iceman was often found to have infections and active inflammation, confirmed through pouchoscopy and biopsy. For instance, on August 31, 2012, Ms. Iceman met with gastroenterologists to evaluate her symptoms, including 15 to 20 watery bowel movements each day, severe abdominal pain, bloody stools, and rectal urgency. (Tr. 791-95). On examination, her abdomen was soft with mild diffuse tenderness to palpation. (Tr. 794). There were no rebound or guarding issues, and normal bowel sounds were present. (*Id.*). A second abdominal examination revealed a soft, non-tender belly without palpable masses. (Tr. 791).

Ms. Iceman's August 24, 2012 colonoscopy revealed severe erythema and ulcerations throughout the colon indicating active pan-ulcerative colitis. (Tr. 794). Pathology results confirmed active colitis in the ascending colon and rectosigmoid colon. (*Id.*). Though Ms. Iceman's abdominal examination was largely normal, objective medical evidence in the form of imaging and pathology results confirmed active gastrointestinal issues and she was scheduled for "subtotal colectomy/end ileostomy as a first step." (Tr. 791). After surgery, pathology testing of the removed gastrointestinal structures revealed severely active inflammatory bowel disease, ulcerative colitis, severe chronic active colitis, active inflammation, and extensive ulceration. (Tr. 1147).

In January 2015, Ms. Iceman made similar complaints of 20 to 30 bouts of diarrhea a day, including five to eight at night. (Tr. 645). While abdominal examination was normal, pouchoscopy revealed ulcerations and the pouch itself was twisted and kinked. (*Id.*).

In February 2015, Ms. Iceman had similar complaints of bowel frequency, nocturnal incontinence, rectal pain, constant fatigue, fever, nausea, and vomiting. (Tr. 640-41). Once again, abdominal examination showed normal bowel sounds, soft and depressible belly, no palpable mass

23

or organomegaly, and no guarding or rebound. (Tr. 643). Testing revealed a C. diff infection. (Tr. 639).

On March 19, 2015, Ms. Iceman's abdominal examination was normal. (Tr. 637-38). That day, a barium enema showed hyperactive bowel. (Tr. 634, 922-23). A pelvic MRI revealed thickening of the pouch wall, suggesting pouchitis. (Tr. 915). On March 25, 2015, abdominal examination again revealed a non-distended abdomen, normal bowel sounds, soft and depressible belly, no palpable mass, and no rebound or guarding. (Tr. 632). Even so, pouchoscopy revealed moderate cuffitis with erythema and nodularity prompting suppository treatment. (Tr. 904). Biopsies revealed reactive gastropathy in the stomach, focal active enteritis in the pouch, and chronic active colitis in the rectal cuff. (Tr. 626).

In May 2016, pouchoscopy revealed a normal looking pouch, but biopsies showed chronic active enteritis in the pouch and chronic active colitis in the rectal cuff. (Tr. 885, 892).

In August 2017, pouchoscopy again revealed a normal appearing pouch, but biopsies showed chronic active enteritis in the terminal ileum, active enteritis with architectural distortion in the pouch, and chronic active proctitis with pyloric gland metaplasia. (Tr. 867, 869).

In February 2021, pouchoscopy revealed a normal appearing pouch but biopsies showed focal active enteritis in the pouch and chronic active colitis with prolapse-type changes in the rectal cuff. (Tr. 1361, 1363-67).

This evidence calls into question the ALJ's analysis as it undercuts the relevance of Ms. Iceman's purportedly "normal" physical examinations, the main finding on which her decision rests. Despite not finding abdominal tenderness or palpable mass, results from pouchoscopies and biopsied intestinal tissue confirmed the presence of chronic inflammation and directed Ms.

Iceman's subsequent treatment with antibiotics and infusion therapy. Moreover, that objective medical evidence tends to support Ms. Iceman's reports of frequent bowel movements and diarrhea as chronic pouchitis and C. diff cause such symptoms. In this context, the ALJ's reliance on normal physical examinations to discount the surgical gastroenterologist's opinion and Ms. Iceman's reported bowel movement frequency is misplaced and suggests a less than thorough level of engagement with the medical records.

There are other discrete issues with the ALJ's decision. Specific to the ALJ's analysis of Ms. Iceman's report of frequent bowel movements, the ALJ determined: "Though she testified that she often has to use the restroom throughout the day, this is not documented in the records." (Tr. 25). Plain from a review of the medical records, and described above, Ms. Iceman consistently reported to her doctors that she has upwards of 25 to 30 bowel movements a day. The ALJ also noted compliance issues "with the claimant missing phone calls, lab work appointments, and medication refills." While it is permissible for an ALJ to find the alleged intensity and persistence of an individual's symptoms inconsistent with overall evidence of record if the individual fails to follow prescribed treatment that might improve symptoms, the ALJ does not do so without considering possible reasons the individual may not comply with treatment. Social Security Ruling (SSR) 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017). Moreover, if an ALJ does find symptoms inconsistent because a claimant is non-compliant with treatment, the ALJ must "explain how [she] considered the individual's reasons in [his] evaluation of the individual's symptoms." *Id.* at *10. Here, the ALJ did not.

After review of the record and comparing it against the ALJ's reasoning in the decision, I conclude the case must be remanded for the ALJ to consider all the relevant medical evidence

properly, without which this Court cannot review for substantial evidence. An ALJ's decision cannot be upheld where she "selectively considered the medical evidence in denying benefits." *Howard v. Barnhart*, 376 F.3d 551, 554 (6th Cir. 2004). I recognize the ALJ need not discuss each and every piece of evidence and finding in the record, *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 n.11 (6th Cir. 2014), but "[s]he may not ignore evidence that does not support h[er] decision, especially when that evidence, if accepted, would change h[er] analysis." *Fleischer*, 774 F. Supp. 2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute […] contradictory, objective medical evidence' presented to him.")). It bears repeating that "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks*, 531 F. App'x at 641 (6th Cir. 2013).

Because the ALJ failed to acknowledge much of the relevant objective medical evidence that appears to support Ms. Iceman's claim for disability, the decision cannot be reviewed for substantial evidence. On remand, the ALJ is directed to consider all relevant evidence in accordance with the regulations and to consider ordering a consultative gastroenterology examination as recommended by the State agency's own consultant on reconsideration.

CONCLUSION

Following review of the administrative record and the applicable law, I **REVERSE** the

Commissioner's decision denying disability insurance benefits and **REMAND** for additional

proceedings consistent with this opinion.

Dated: March 29, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE